648 S.E.2d 578

In the Matter of John A. PINCELLI, Respondent.

No. 26349.

Supreme Court of South Carolina.

Submitted May 15, 2007.

Decided June 25, 2007.

Henry B. Richardson, Jr., Disciplinary Counsel, of Columbia, for Office of Disciplinary Counsel.

J. Steedley Bogan, of Columbia, for respondent.

PER CURIAM.

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an

Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the Agreement, respondent admits misconduct and consents to the imposition of a two year suspension from the practice of law. He requests the suspension be made retroactive to the date of his interim suspension.[1] We accept the Agreement and impose a two year suspension from the practice of law, retroactive to the date of respondent's interim suspension. The facts, as set forth in the Agreement, are as follows.

## FACTS

Respondent's legal practice was devoted to the area of mortgage foreclosures in which respondent represented mortgagees. The majority of respondent's mortgage foreclosures came from one client, hereafter referred to as Client A, and, to a lesser extent, foreclosures from several other clients, one of which is referred to as Client B.

Several assistants and a bookkeeper worked for respondent in his law office. A particular legal assistant (Legal Assistant) was responsible for managing the foreclosure operations of respondent's law firm. The bookkeeper was responsible for making deposits and writing checks as directed by others in respondent's office.

Respondent represents that in March 2005 he discovered that his office had not been handling money belonging to Client A in accordance with the net funding provisions of his retainer agreement and that the funds had been misdirected by someone in his office. According to respondent, when he made this discovery, he immediately contacted Professor Robert Wilcox for ethical advice and retained J. Steedley Bogan as his legal and ethics counselor. Shortly thereafter, respondent hired a CPA firm to audit his trust account concerning funds his law office handled for Client A. Within days of receiving the completed audit from the CPA firm which confirmed misapplication of Client A's funds, respondent reported the audit findings to Client A, promptly reimbursed Client A in the amount of $80,519.47 (which was the amount of funds the

[1]. On August 10, 2005, the Court placed respondent on interim suspension. *See In the Matter of Pincelli*, 365 S.C. 343, 618 S.E.2d 883 (2005).

audit reported had been misdirected), and self-reported the matter to ODC.

Later, after ODC began reviewing records furnished by respondent, it was discovered additional funds (albeit in relatively smaller amounts) had also been diverted from Client A and that funds had also been diverted from Client B. Respondent represents that he promptly paid the additional amounts to Clients A and B and believes no additional amounts are due Clients A and B.

More specifically, respondent's law firm (Pincelli & Associates) had a written agreement for services (the Retainer Agreement) with Client A which provided, among other things, that there would be no "net funding" (i.e., that all proceeds from foreclosure actions received by respondent as attorney for Client A would be forwarded to Client A along with respondent's statement for fees and costs which would then, if approved by Client A, be paid by Client A to respondent). In other words, under the terms of the Retainer Agreement, respondent was not permitted to retain any monies whatsoever for fees and costs in connection with the foreclosure actions and, instead, respondent was required to remit all funds received on behalf of Client A directly to Client A and then look to Client A for subsequent payment of approved fees and costs for respondent's services related to mortgage foreclosures.

It is now known that Client A and Client B failed to receive all funds due them from the sale of several properties foreclosed upon by respondent. In addition, Client A, Client B, and an unknown client were not timely paid some funds received by respondent or his law firm from the forfeiture of compliance deposits on properties where third parties were successful bidders at foreclosure sales.[2] Instead, there was a misapplication of net funds of some of these defaulting bids.

The Agreement details more than twenty occasions in which respondent did not forward funds to Client A, Client B, and an unknown client in accordance with the net funding provisions

---

**2.** These forfeitures occurred when a successful bidder on a parcel of property made a "good faith" deposit of 5% of the sales price and then failed to tender the balance of the sales price within thirty days of the sale.

of the retainer agreements by either failing to remit all funds from the successful third party bidder on property where his clients had received foreclosure judgments in excess of the highest bid or failing to remit forfeited third party deposits to his clients.[3]

In each of the occasions detailed in the Agreement, respondent's bookkeeper wrote checks on respondent's trust account either upon respondent's own direction or that of Legal Assistant. Either respondent or Legal Assistant instructed the bookkeeper on the amount and payee for each check. All checks were signed by respondent. The checks from respondent's trust account were made payable to Legal Assistant, to respondent, to respondent's law firm, to others, and, on one occasion, to Bank of America for an amount owed by respondent.

Respondent represents he was unaware that the client funds were being withheld in contravention of the retainer agreements when he signed the trust account checks and, consequently, unaware that the checks he signed to himself, his law firm, and others were for funds belonging to Clients A and B and an unknown client. Respondent represents Legal Assistant withheld and caused to be disbursed the monies so withheld on her own initiative without instructions from respondent.

As noted above, respondent represents that, when he became aware of the improper withholding of the client funds, he sought legal advice, had an audit completed, and promptly

---

3. For purposes of illustration, the Court sets forth one of those occasions. Respondent brought a foreclosure action on behalf of Client A against a mortgagor seeking to foreclose a mortgage on a parcel of property. Respondent obtained a judgment of foreclosure against the defendant in the amount of $82,893.44. Client A instructed respondent to bid $23,000 at the sale. A third party was the successful bidder with a bid of $23,100. After the deduction of statutory costs and disbursements, respondent received from the court hearing net sales proceeds of $22,857 which was deposited into respondent's trust account. Thereafter, respondent remitted only $22,400 of the sales proceeds to Client A, leaving a balance of $457 in respondent's trust account. The $457 was paid by check signed by respondent to Pincelli and Associates. Since the successful high bid by the third party was less than the judgment rendered to Client A, all net proceeds were the property of Client A and therefore $457 should have been paid to Client A.

remitted the funds due to Client A. Thereafter, he submitted as self-report with ODC.

In the self-report, respondent represented as follows:

When a property was foreclosed upon and sold at the Master's sale my bookkeeper received the sale proceeds from the Court. [The bookkeeper] had been instructed to forward to [Client A] the actual amount of their authorized bid and then retain in the trust account the excess which was actually paid by a third party. The amount retained was then to be disbursed *in part to the law firm to pay costs and fees. Any remainder was to be disbursed to the client.*

*Fortunately, the audit revealed that no funds were stolen by the bookkeeper. Instead, these funds were paid by the bookkeeper to my law firm general account and were used in our normal course of doing business.*

While I had no prior knowledge that this was the bookkeeper's practice, I now recognize, and should have recognized at the time, that the excess funds should have been sent to the client.

I provided a copy [of that audit report] to the client and immediately forwarded [Client A] a check for $80,519.47 which was the amount that the audit determined that I owed.

I am writing the Commission to let you know that *I have failed to properly supervise the bookkeeper* who was processing the trust account. It appears ... that I have violated Rule 417 in that I did not operate my [trust] account in strict compliance with Rule 417 by personally approving each foreclosure settlement sheet and by personally making sure that monthly reconciliations of the trust account were performed. I also admit that I violated Rule 1.15(b) in not safekeeping my client's money.

The self-report incorrectly indicates that the amounts then known due to Client A were the result of bookkeeper error. However, it is now known that the amounts so withheld from Client A were not in any way due to any fault, mistake, or wrongdoing on the part of the bookkeeper. Further, the self-report incorrectly states that the funds withheld were paid into respondent's law firm general account and used in the

"normal course of doing business." However, it is now known that some of the funds were paid not only into respondent's general account but, on occasion, paid directly to respondent, his employees, and, at least in one instance, toward amounts due on respondent's credit card. Respondent represents the incorrect statements in his self-report were unintended. He readily acknowledged the inaccuracies of the initial information after reviewing additional information and bank records and discussing the matter with his own counsel and ODC.

Respondent acknowledges that he failed to properly supervise Legal Assistant in the handling of the foreclosure actions and the disbursement of the proceeds there from. He agrees he allowed Legal Assistant, a paralegal with considerable experience in foreclosure actions, to handle most all aspects of the foreclosures referenced in the Agreement with virtually no supervision or guidance. Respondent acknowledges telling Legal Assistant when he needed certain amounts of money paid to himself, his law firm, or others, but, again, represents he was unaware these amount were being paid from monies belonging to clients. ODC has no factual basis to dispute this representation and, in fact, Legal Assistant confirmed respondent's representation in a sworn interview.

Respondent further acknowledges that he failed to personally reconcile his trust account on a monthly basis as required by the provisions of Rule 417, SCACR, and that he failed to comply with provisions of some retainer agreements, both of which facilitated the misapplication of the clients' funds. Furthermore, respondent now recognizes that allowing Legal Assistant to handle the mortgage foreclosure aspect of his law practice with almost no supervision by a licensed attorney caused him to assist Legal Assistant in the unauthorized practice of law.

Further, respondent recognizes that he provided incorrect information in his initial report to ODC and in his response to ODC's Notice of Full Investigation. However, respondent represents that these misrepresentations were unintentional and now acknowledges that a more careful review of his files and bank records prior to filing his self-report and response to the Notice of Full Investigation would have precluded these incorrect representations. In mitigation, but not as a defense,

respondent points out that this incorrect information was not apparent from the audit report. ODC has no factual basis to dispute these representations, especially in view of Legal Assistant's sworn testimony supporting the representations made by respondent.

The audit report states respondent's law firm used the trust account to hold funds from fees earned by respondent as a lecturer. After respondent received the audit report, he removed the lecture fee funds from the trust account. Respondent recognizes that, in placing those lecture fees in his trust account, he commingled non-client funds with client funds.

Respondent asserts that all amount known due to Clients A and B have been repaid. He agrees that, should it be discovered that any additional amounts are due to any clients as a result of the misconduct herein, he shall pay the amounts as quickly as practical.

Respondent has not been previously sanctioned for professional misconduct nor found to have committed professional misconduct by the Commission on Lawyer Conduct, its predecessor entity, the Board of Grievances and Discipline, or this Court.

## *LAW*

Respondent admits that his misconduct constitutes grounds for discipline under Rule 413, RLDE, specifically Rule 7(a)(1) (lawyer shall not violate Rules of Professional Conduct or any other rules of this jurisdiction regarding professional conduct of lawyers) and Rule 7(a)(6) (lawyer shall not violate oath of office). Respondent further admits he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to a client); Rule 1.15 (upon receiving funds which belong to a client, lawyer shall promptly deliver the funds to the client); Rule 5.1 (lawyer shall charge reasonable fee); Rule 5.3 (lawyer having supervisory authority over non-lawyer employee shall make reasonable efforts to ensure non-lawyer's conduct is compatible with professional obligations of lawyer); and Rule 5.5 (lawyer shall not assist non-lawyer in performance of activity which constitutes unauthorized practice of

law); Rule 8.4(a) (lawyer shall not violate the Rules of Professional Conduct); and Rule 8.4(e) (lawyer shall not engage in conduct that is prejudicial to administration of justice). Finally, respondent admits that he has violated the recordkeeping provisions of Rule 417, SCACR.

## CONCLUSION

We accept the Agreement for Discipline by Consent and impose a two year definite suspension from the practice of law, retroactive to the date of respondent's interim suspension. In addition, as stated in the Agreement, within thirty (30) days of the date of this opinion, respondent shall pay the costs of ODC's investigation into this matter to the Commission on Lawyer Conduct.[4] Within fifteen days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

**DEFINITE SUSPENSION.**

TOAL, C.J. MOORE, BURNETT and PLEICONES, JJ., concur.

WALLER, J., not participating.

---

4. The Agreement provides that ODC's costs were $916.50.